THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* CONSTANTINE KAY, Defendant.

City Magistrates' Court of New York City, August 5, 1931.

*Walter R. Kiernan,* for the complainant.

*William Karlin,* for the defendant.

BRODSKY, City Magistrate. The complainant, Mary Kay, charges the defendant, Constantine Kay, with being a disorderly person by reason of his abandonment of and his failure adequately to support her. The defendant denies that he is a disorderly person by virtue of his failure to support complainant because he alleges that he is not her husband. The complaint is brought under section 899, subdivision 1, of the Code of Criminal Procedure, which reads as follows: " The following are disorderly persons: 1. Persons who actually abandon their wives or children, without adequate support, or leave them in danger of becoming a burden upon the public, or who neglect to provide for them according to their means."

It becomes immediately obvious, therefore, that the complainant must establish and the court must find as a matter of fact that the defendant is the husband of the former before guilt of the charge laid against him may be imposed. The determination of this issue depends largely on a consideration of the facts.

The testimony shows that the complainant and one Riegelman were married at St. Petersburg, Russia, in 1913. After Russia's entry into the war, Riegelman was assigned to his post as a colonel in the Imperial Russian Army. The complainant and Riegelman moved from St. Petersburg to Lvoff (Lumberg). This period, according to complainant's testimony, was the last during which Colonel Reigelman was seen alive by her.

In 1918 she instituted divorce proceedings against Colonel Reigelman in the St. Petersburg Consistory. This divorce proceeding was never completed, and the marriage between the parties was not dissolved by any court or church order.

The revolution in Russia caused the complainant to flee to Turkey (the haven of the Czarist Russians). She fled with one Kostenko, an officer on board General Wrangel's flagship, and lived with him as husband and wife. This relationship was continued in Constantinople, during all of which time the complainant was known as Mrs. Kostenko.

In 1922 the complainant met the defendant in Turkey and she alleges that in May, 1922, she was married to him. The complainant is not clear on the circumstances surrounding her marriage. She testified that the defendant and another friend and herself went to some place, which she cannot remember, and they signed

the paper. Thereafter the defendant told her that they were married. There, of course, was no church marriage as required by the Russian law.

In 1923 the complainant and the defendant came to the United States, where they lived together as man and wife until May 10, 1927. The complainant left the defendant because of ill health. The evidence further discloses that the defendant held the complainant out as his wife, and on this issue the court finds for the complainant. In other words, at the conclusion of the trial it was determined by the court that the parties had intermarried in so far as they were able to consummate that act. Whether or not there was an existing legal impediment to the consummation of this marriage is the question of law here involved. It is contended by the complainant that her marriage to the defendant was legal because she had not seen her first husband, Riegelman, since 1916, and that, although her marriage to him had not been annulled by a court of competent jurisdiction or pursuant to church law as required by the laws of Russia, her first husband's absence for a period of five years, namely, between 1916 and 1922, permitted her legally to effectuate a marriage with the defendant.

It is urged by the defendant, however, that neither under the laws of Russia, Turkey nor the United States was the marriage between the complainant and Riegelman legally dissolved, and that, therefore, no matter how effectively he may have held the complainant out as his wife and irrespective of the so-called civil marriage in Turkey, which he denies, the marriage between himself and the complainant is void under the laws of the United States.

Where a prior valid and subsisting marriage exists, no subsequent marital relationship may be proper or legal despite the actions or intentions of the parties thereto, unless there is first a proper termination pursuant to law of the existing marital union. Was there a valid subsisting marriage existing at the time the parties herein attempted matrimony?

There is a presumption that a marriage now existing is valid since the law frowns on immoral relations. But the presumption is overcome by factual invalidity of the present marriage. The law likewise presumes that a marriage validly entered into exists until and unless terminated by a court of competent jurisdiction. It is undisputed that there was no divorce or termination of the marital state with Reigelman. Hence the marriage with Reigelman was valid and subsisting at the time the parties herein attempted their union. The present marriage was, therefore, void, since the disability and impediment existed at the time this marriage was contracted. A person who has entered into a valid marriage is incapacitated

while such marriage remains in effect or is undissolved pursuant to law to contract a subsequent marriage.

The proceeding of divorce commenced by the complainant in St. Petersburg Consistory is a nullity, since it was not completed and failed to affect the marital relationship between the complainant and Riegelman.

The marriage of Colonel Riegelman and the complainant is admitted by the parties herein. The defendant denies, however, the allegation of the complainant concerning his marriage to her. The complainant is thus put to her proof that such allegation is correct. (*Fischer* v. *Fischer*, 254 N. Y. 463, 466.) The burden is, therefore, on the complainant to prove that she was validly married to the defendant herein. Irrespective, however, of where the burden of proof lies, the conclusion is irresistible that there was a legal impediment to the marriage between the complainant and the defendant.

We come now to the question of whether the death of Riegelman is presumed because of the failure of the complainant to see him for a period of seven years. The complainant instituted divorce proceedings against Riegelman in 1918. She, therefore, knew or believed that her husband was alive at that date, for it seems inconceivable that she would seek a divorce from one whom she believed non-existent. So, despite the fact that she last saw Colonel Riegelman in 1916, we must recognize with her his existence at least in 1918. There can, therefore, be no presumption of Riegelman's death at the time that the complainant married the defendant in 1922, which is but four years later, or on the arrival of the parties to this proceeding in 1923, which is not quite five years subsequent to the institution of the divorce proceedings. In addition thereto, the complainant moved from the country whereat her husband Riegelman remained. It is, therefore, improbable that she would have seen her husband Riegelman since her activities were centered in different circles and in different countries from where Riegelman was likely to be found. The failure, therefore, of the complainant herein to see her husband for a period of years was not the result of willful and intentional abandonment by Colonel Riegelman of his wife. The presumption, therefore, cannot arise in favor of the complainant when she married Kay.

The Riegelman marriage subsisted and was valid in 1922, when the parties herein attempted marriage in Turkey. Polyandry is not recognized by Turkish law, and hence this complainant could not have been wedded to this defendant. But even assuming that this marriage might have been valid in Turkey, we cannot accept its validity in this jurisdiction. The doctrine of comity must yield to

the positive law of the land. Foreign law will not be given effect when to do so would be contrary to the settled public policy of the forum. (*Marshall* v. *Sherman*, 148 N. Y. 9.)

Marriages consummated in foreign countries which are within prohibited limits of consanguinity must, therefore, be held invalid in domestic jurisdiction.

The general rule is that the validity of a marriage is determined by the law of the place where it was contracted; if valid there, it will be held valid everywhere, and, conversely, if invalid by the *lex loci contractus*, it will be held invalid wherever the question might arise. (38 C. J. 1276.) Where, however, the marriage in question is repugnant to the public policy in respect of polyandry, incest, miscegenation, polygamy, or contrary to its positive laws, the general rules will not apply.

Section 6 of the Domestic Relations Law, as it read immediately after the 1915 amendment (Laws of 1915, chap. 266), provided that "A marriage is absolutely void if contracted by a person whose husband or wife by a former marriage is living, unless either:

"1. Such former marriage has been annulled or has been dissolved for a cause other than the adultery of such person. * * *

"3. Such former husband or wife has absented himself or herself for five successive years then last past without being known to such person to be living during that time."

Subdivision 3 of this section has been amended to read that " such former marriage has been dissolved pursuant to section seven-a of this chapter." (Laws of 1922, chap. 279, § 1.) While the *lex loci contractus* determines the validity or invalidity of a marriage, that rule does not obtain with regard to polygamous marriage, and a marriage performed in a foreign jurisdiction between persons of whom one was then bound by an existing marriage is void in this State, even though the same is valid in the jurisdiction where it was contracted. (*Earle* v. *Earle*, 141 App. Div. 611.) (See, also, *Moore* v. *Hegeman*, 92 N. Y. 521.) Conversely it follows that, if a polygamous marriage will not be recognized by the courts of this State, then certainly a polyandric marriage would not be recognized by this State because it is against the public policy thereof, and also it would be invalid in the *lex loci contractus*.

Where a marriage is void, it is void from its inception without any decree of the court and for all purposes despite any acts or intentions of the parties. There can be no such thing as estoppel to bring about the validity of the marriage if it is denied in its inception. (*McCullen* v. *McCullen*, 162 App. Div. 599.) (See, also, *Earle* v. *Earle*, 141 App. Div. 611; *Dye* v. *Dye*, 140 id. 309; *Pettit* v. *Pettit*, 105 id. 312; *Cropsey* v. *McKinney*, 30 Barb. 47;

*Tiedemann* v. *Tiedemann,* 94 Misc. 449; *Chittenden* v. *Chittenden,* 64 id. 649.)

Apparently, in the absence of evidence to the contrary, the second marriage will be presumed valid. But this presumption has been overcome by the fact that a valid marriage prevented another marriage from coming into being until the termination of the first marriage. It has been held that, where a woman marries while her husband is still living, the second marriage is absolutely void and cannot be validated by ratification. (*McCullen* v. *McCullen,* 162 App. Div. 599.) The marriage relation is not severed even by an interlocutory judgment entered in an action for divorce, and it remains in full force and effect until final judgment is obtained. It follows then that neither party may validly marry until the first marriage has been terminated. (*Pettit* v. *Pettit,* 105 App. Div. 312, revg. 45 Misc. 155.)

We come then to a consideration of section 7, subdivision 5, of the Domestic Relations Law. While this section has been repealed by the Laws of 1922, chapter 279, section 2, it was re-enacted in substance as section 7-a by section 3 of chapter 279 of the Laws of 1922, which provides that a marriage may be dissolved on the ground of absence. A party to the marriage must present to the Supreme Court a duly verified petition showing that his or her spouse has absented himself or herself for five consecutive years then last past. The court shall thereupon require that the notice of the presentation of the petition shall be made public. After all the requirements are properly fulfilled the court may make an order dissolving such marriage. Since the present marriage took place in May, 1922, it comes within section 7-a of the Domestic Relations Law, which became effective March 25, 1922, preceding the date of this marriage. In any event, it has been held that this provision relates only to marriages celebrated within this State and cannot be invoked to sustain a marriage celebrated elsewhere. (*Matter of Kutter,* 79 Misc. 74.) Unless there is a dissolution under section 7-a, the marriage is void if the spouse by the previous marriage is living. The expert testimony, uncontradicted at the trial, disclosed that, under the Russian and Turkish laws while the presumption of death existed after the lapse of a certain period of time, the party is not permitted to remarry unless such presumptive death or actual death has been decreed by either church or court order. In this case it appears that no such decree was entered. Therefore, even if the status of the parties should be determined by the laws of either Russia or Turkey, the complainant finds herself in no more favorable position. There being no proof of the death of Riegelman at the time of the complainant's marriage to Kay and the presumption of

death being inapplicable because a period of seven years had not elapsed and similarly because the complainant's marriage to Riegelman had not been dissolved pursuant to section 7-a of the Domestic Relations Law, the court must find that the marriage between the complainant and the defendant was void in its inception.

The court, therefore, finds the defendant not guilty and directs his discharge.